UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 17-CR-111 (SRN)

UNITED STATES OF AMERICA,

    Plaintiff,

v.                              **GOVERNMENT'S SENTENCING POSITION PLEADING**

RICKY GERALD JASON,

    Defendant.

The United States, by its attorneys, Gregory G. Brooker, Acting United States Attorney for the District of Minnesota, and Carol M. Kayser, Assistant United States Attorney, hereby files this Position on Sentencing in support of its request that the Court sentence Defendant Ricky Gerald Jason to a term of imprisonment of 336 months following his conviction for (1) Distribution of Child Pornography; and (2) Coercion and Enticement. Jason is a diagnosed pedophile who repeatedly raped a 12-year old the same month he "successfully" completed sex-offender treatment following a 2010 conviction for Possession of Child Pornography. Clearly, Jason is a profound danger to the community. A sentence of 336-months' imprisonment is sufficient, but not greater than necessary to comply with the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation.

## I. BACKGROUND FACTS

A. 2010 Child Pornography Conviction

In June of 2010, law enforcement successfully downloaded child pornography from Jason, who was then 25-years old. PSR ¶ 56. Thereafter, law enforcement executed a search warrant at his residence and seized his electronics. *Id.* A search of the electronics revealed multiple images of child pornography. *Id.* Initially, Jason denied that he intentionally viewed or possessed the child pornography. *Id.* Similarly, he denied downloading child pornography or being attracted to children. ¶ 81. Rather, he claimed that he had the child pornography as a by-product of his searches for adult pornography. *Id.* ¶ 56. Despite his denials, Jason pleaded guilty to multiple counts of Possession of Child Pornography. *Id.* Jason was sentenced to 90 days in custody. *Id.*

B. Pedophile Diagnosis & Sex-Offender Treatment

As a result of his conviction, Jason had a psychosexual evaluation in 2011 which diagnosed him as a pedophile. PSR ¶ 81. Test results suggested that Jason was not forthcoming during the testing. *Id.* For example, he continued to minimize his culpability for the underlying offense. *Id.* His scoring on the multiphasic sex inventory also suggested that he was "dishonest about his sexually deviant interests." *Id.* The testing also showed that Jason was "not motivated for treatment." *Id.*

Following his release from state custody, Jason was required to attend sex-offender treatment. PSR ¶ 82. He fared poorly. *Id.* ¶¶ 82-88. He was not invested in treatment and was only "minimally compliant." *Id.* ¶ 82, 84, 87. He was discharged from treatment in

July 2016, the same month that his girlfriend, E.V., moved in with him, bringing with her the 12-year old victim. *Id.* ¶¶ 73, 88.

C. <u>The Instant Offenses</u>

In April 2016, while Jason was still on probation for the 2010 child pornography offense, law enforcement began successfully downloading child pornography from an electronic device at Defendant's residence. PSR ¶ 6. That pornography included video files depicting prepubescent children engaging in sexual acts with adults. *Id.* In July 2016, law enforcement successfully downloaded additional images of child pornography from Defendant's residence. *Id.* ¶ 7; Plea Agreement ("PA") ¶¶ 2b-2c. In late August 2016, law enforcement executed a search warrant at Defendant's residence and seized various electronics. *Id.* ¶ 8.

Among the electronic devices seized was a cellular telephone belonging to Jason. The removable memory of the phone contained images and videos of child pornography. PSR ¶ 15. The phone had a messaging application called "Text Now" installed. *Id.* ¶ 9; PA ¶ 2f. Jason used the application under the name "Cody Donte." *Id.*; PA ¶ 2f. A forensic review of the phone revealed that Jason, posing as Cody Donte, had used the messaging application to manipulate E.V.'s 12-year old daughter and become her on-line boyfriend. *Id.* As part of his manipulation, the Cody Donte persona controlled the 12-year old's access to some of her online accounts. Jason would block the 12-year old's internet access to coerce her to follow his commands. *Id.* The Cody Donte persona repeatedly instructed the 12-year old to engage in sexual activity with Jason. *Id.*; PA ¶¶ 2f-2k. He also warned the 12-year old not to tell her mother: "And she better NOT FIND OUT ABOUT THE

3

stuff I like you doing." *Id.* ¶ 9, p. 5 (emphasis in original). Further investigation revealed that Jason sexually assaulted the 12-year old on at least 5 occasions between July and August 2016. *Id.* ¶ 11; PA ¶ 2k.

## II. ARGUMENT AND CITATION OF AUTHORITIES

In 1984, Congress created the United States Sentencing Commission. *Mistretta v. United States*, 488 U.S. 361, 362, 366-367 (1989). The Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.*, directed that Commission to promulgate uniform guidelines that would be binding on federal courts at sentencing. *Id.* at 367. One purpose of the Guidelines was to address and eliminate sentencing disparities among similarly situated offenders. *See Koon v. United States*, 518 U.S. 81, 113 (1996); 28 U.S.C. § 991 (b)(1)(B). Congressional statutes instruct the Commission to carry out the objectives of 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 348 (2007). Significantly, as the United States Supreme Court observed in *Rita*:

> The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill this statutory mandate. They also reflect that the fact that different judges (and others) can differ as to how best to reconcile the disparate ends of punishment. . . . [I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives

551 U.S. at 349, 350. Consequently, although the Guidelines are no longer mandatory, *see United States v. Booker*, 543 U.S. 220, 245-258 (2005), "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). "The post-

4

*Booker* federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark through the process of appellate review." *Peugh v. United States,* __U.S.__, 133 S.Ct. 2072, 2083 (2013).

In *Gall*, the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence. *Id.* at 49-50; *United States v. Ruvalcava-Perez,* 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors").

A. <u>The Guidelines Range</u>

The Government submits that the Presentence Report ("PSR") issued July 12, 2017, correctly calculates the applicable advisory Guidelines range: Life. PSR ¶ 105. The advisory Guidelines range calculated in the PSR mirrors the range calculated by the parties in the PA. *See* PA ¶ 7g. Specifically, both the PA and the PSR calculated a final adjusted base offense level of 43. PA ¶ 7e; PSR ¶ 52. Likewise, the PSR concluded that Jason's Criminal History Category was III (PSR ¶ 60), which was contemplated by the parties in the PA (PA ¶ 7f). With an adjusted base offense level of 43, and a Criminal History category of III, Jason's advisory Guidelines range is Life in prison.

B.     <u>An Examination Of The 3553(a) Factors Demonstrates That A Sentence Of 336 Months' Imprisonment Is Appropriate</u>

The district court may not assume that the Guidelines range is reasonable, but instead must make an individualized assessment based on the facts presented. *Gall*, 552 U.S. at 50. Section 3553(a) requires the Court to analyze a number of factors, including the history and characteristics of the defendant, the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, the need for deterrence, and the need to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a). An analysis of these factors shows that a sentence of 336 months' imprisonment is appropriate. Whether termed a downward departure under U.S.S.G. §5H1.3, or a downward variance based on Jason's history and characteristics, the Government believes that a sentence of 336 months' imprisonment is sufficient, but not greater than necessary, to satisfy the purposes of criminal sentencing. A sentence below 336 months' imprisonment is not warranted.

       1.     <u>History and Characteristics of the Defendant</u>

Section 3553(a)(1) directs the sentencing court to consider the history and characteristics of the defendant.[1] These factors represent a mixed bag; there are some

---

[1] Section 3553(a)(1) also instructs the sentencing court to consider "the nature and circumstances of the offense." To a large extent, "the nature and circumstances of the offense component" overlaps with the next listed consideration, which is "the need for the sentence imposed -- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." See 18 U.S.C. § 3553(a)(2)(A). Accordingly, these factors are discussed together below.

mitigating factors and some aggravating factors. On balance, however, Jason's history and characteristics support a sentence of 336 months' imprisonment.

Defendant grew up in a two-parent household, although his primary father figure, D.S., is not his biological father. PSR ¶¶ 63, 64. Defendant's mother was diagnosed with some cognitive impairments; nevertheless, she lived independently in the community and was capable of making decisions. *Id.* ¶ 68. There is some indication that Jason suffered sexual abuse as a child, although the extent of that abuse is unclear. *Id.* ¶ 79.

Jason dropped out of school his junior year of high school, and he never pursued a GED. PSR ¶¶ 93, 94. He has no significant job history, and he has not been employed since 2014. *Id.* ¶¶ 96-99.

His first pornography conviction occurred in 2010, when Jason was 25 years old. PSR ¶ 56. As a result of that conviction, Jason underwent a psychosexual evaluation and was diagnosed as a pedophile. *Id.* ¶ 81. His testing indicated deception, specifically that he was "dishonest about his sexually deviant interests." *Id.* In treatment, Jason acknowledged that he began viewing child pornography in 2008 or 2009. *Id.* ¶¶ 72, 85. He explained that he would download the pornography, masturbate, delete it, and then repeat this cycle every other day, three to four hours each time." *Id.* ¶ 85. Judging from Jason's repeated violations of his probation, it does not appear that Jason ever truly stopped viewing child pornography after his 2010 arrest.

On the subject of Jason's mental health, Jason's stepfather, D.S., never saw any signs of mental illness in Defendant. PSR ¶ 74. Indeed, D.S. explained that Jason never discussed feeling depressed or anxious until he was first arrested in 2010. *Id.* Following

7

that arrest, D.S. supported Jason through counseling and agreed to be someone that Jason could call if he had any thoughts of re-offending. *Id.* ¶ 74. D.S. was alarmed when Jason started dating E.V., the victim's mother. Indeed, he was so alarmed that he called the authorities and personally warned E.V. that Jason could end up in jail and her daughter taken away. *Id.* ¶ 75. Based on his lifelong knowledge of Defendant, D.S. believes that Jason may be exaggerating his claims of mental illness in hopes of receiving a lesser sentence. *Id.*

More troubling is D.S.'s suspicion that Jason's relationship with E.V. was motivated by a desire to gain access to the victim. PSR ¶ 75. In or about 2011-2012, Jason was diagnosed with agoraphobia, anxiety, and depression. *Id.* ¶ 82-83. In October 2013, a therapist noted that he had "very little motivation or initiative." *Id.* ¶ 82. Nonetheless, Jason entered into a romantic relationship with E.V. in May of 2015. *Id.* ¶ 73. E.V. and her 12-year old daughter, the victim, moved in with Jason in or about July 2016, as soon as his probation on the 2010 pornography charge expired. *Id.* This coincided with Jason's discharge from sex-offender treatment. *Id.* ¶ 88. Soon thereafter, Jason began raping the victim. *Id.* ¶¶ 11, 88; PA ¶ 2k. Given this timeline, D.S.'s suspicion that Jason entered into the relationship with E.V. to gain access to the 12-year old appears well-founded. Jason's history and characteristics support a sentence of 336 months imprisonment.

    2.    <u>Nature and Circumstances of the Offense</u>

The second factor a sentencing court must consider is "the need for the sentence imposed -- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A). As stated, this requirement extends

beyond, but also overlaps to some extent with, the "nature and circumstances of the offense" component of Section 3553(a)(1). The Section 3553(a)(2)(A) consideration is the "just desserts" concept, which carries the need for retribution, the need to make the punishment fit the crime, and the need not just to punish, but to punish justly. "[I]t is another way of saying that the sentence should reflect the gravity of the defendant's conduct." Committee on the Judiciary, Report No. 98-225, 98 Cong. 1st Sess. 1983, p. 75.

Of course, child sex crimes are among the most egregious and despicable of societal and criminal offenses. The Supreme Court has long recognized that childhood sexual abuse has devastating and long-lasting effects on its victims. See New York v. Ferber, 458 U.S. 747, 758 n. 9 (1982) ("It has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults"). Defendant's crime is particularly horrific – he repeatedly raped a 12-year old girl for his own sexual gratification. It appears that he developed a relationship with the child's mother to gain access to her. The evidence is clear that he manipulated the child. Specifically, Jason assumed the Cody Donte persona to engage the child in a relationship. He paid her compliments and showed her attention. He maneuvered to become her on-line boyfriend. From that position of trust, he coerced the child to allow Jason to rape her. In fact, in one text the victim "confronted" Cody/Jason: "Don't you get that I trusted one person that I thought could help me and it was all just to do your fantasy . . . ..." Id. ¶ 9, p. 4. The 12-year old victim was right.

Significantly, Jason committed the instant offenses while he was completing sex-offender treatment. That treatment did nothing to stop Jason's behavior. Rather, it appears

9

that Jason successfully manipulated his therapist as well. Jason's July 2016 discharge letter stated he was "not seen as a risk to reoffend in a sexual manner. He is aware of his triggers to reoffending and reports utilizing the support group he has developed appropriately." PSR ¶ 88. But Jason did not utilize his support group, which included his step-father, who had supported him throughout his counseling. *Id.* ¶ 75. The nature and circumstances of Jason's conduct demonstrate that he is a manipulative, child predator who repeatedly sexually abused a 12-year old who considered him a father figure. A sentence of 336 months' imprisonment is just punishment.

      3.     The Need for Deterrence

In this case, there is a need for both individualized and general deterrence. Individualized deterrence is that which discourages Jason from engaging in these behaviors again. In light of Jason's history, the Government questions whether it is possible to deter this defendant from re-offending. Jason's criminal history shows that his criminal conduct only escalated after his initial child pornography conviction. As reflected in the PSR, Jason repeatedly violated the terms of his probation. Each time, the criminal justice system responded with measured attempts to motivate him to become law-abiding, all to no avail. Leniency did not prompt Jason to become law abiding. Perhaps it only emboldened him. A significant sentence of 336 months' imprisonment is an appropriate attempt to deter Jason from committing crimes again in the future.

A significant sentence is also important as a general deterrent. General deterrence is the public response necessary to deter other people from committing similar crimes. "Congress has specifically made general deterrence an appropriate consideration under

3553(a)(2)(B), [it is] one of the key purposes of sentencing." *Ferguson v. United States*, 623 F.3d 627, 631-32 (8th Cir. 2010). Moreover, Congress, the United States Supreme Court, and the United States Sentencing Commission have made clear that general deterrence is an important sentencing goal in child pornography offenses. *See United States v. Irey,* 612 F.3d 1160, 1206 (11th Cir. 2010) ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product") (*citing Ferber,* 458 U.S. at 760), *cert. denied,* 563 U.S. 917 (2011). Child pornography and the concomitant sexual abuse of children is a pervasive blight on society that continues to spread. Unfortunately, with the advent of the internet and the use of various social media platforms, the internet has become a powerful tool for would-be child abusers like Jason. The Court is in a position to send a strong message to people like Jason who use the internet to exploit children for their own sexual gratification. A sentence of 336 months' imprisonment is appropriate as both an individual deterrent and a general deterrent.

4. <u>The Need To Protect The Public From Further Crimes Of This Defendant</u>

In sentencing Jason, the Court must weigh the need to protect the public from his future crimes. *See* 18 U.S.C. § 3553(a)(2)(C). "The basic task is to predict the likelihood that the offender will commit further offenses, assess the potential seriousness of those offenses, and determine the need to incapacitate the offender as a prophylactic measure." *Irey,* 612 F.3d at 1238.

There are a multitude of studies and research to support the proposition that a hands-on offender like Jason is a danger to the community who is likely to re-offend. *See* Krista Blaisdell, Note, Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders, 43 Va. U.L. Rev. 1155, 1192, n.150 (2009) (compiling Congressional statements regarding the high risk of recidivism among child sex offenders); *see also Smith v. Doe*, 538 U.S. 84, 103 (2003) (noting "[t]he risk of recidivism posed by sex offenders is 'frightening and high'"); *McKune v. Lile*, 536 U.S. 24, 33 (2002) ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault"); *United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011) ("Statistical analysis of sex crimes has shown that the best predictor of recidivism is . . . sexual interest in children. . . . A pedophilic sex offender who has committed both a child-pornography offense and a hands-on sex crime is more likely to commit a future crime, including another hands-on offense, than a defendant who has committed only a child-pornography offense"), *cert. denied*, __U.S.__, 132 S.Ct. 2373 (2012); *Irey*, 612 F.3d at 1214 (noting that the "threat of recidivism by a pedophile who has sexually abused a child is 'appalling'").

Even without these studies, the Court can conclude that Jason is a danger to recidivate. In considering his likelihood of recidivism, "a court may take into account any

evidence of obvious incorrigibility and conclude that leniency has not been effective." *United States v. Gant*, 663 F.3d 1023, 1030 (8th Cir. 2011) (*quoting United States v. Walking Eagle*, 553 F.3d 654, 657 (8th Cir. 2009)); "[E]ven offenses which are minor and dissimilar to the instant crime may serve as evidence of likelihood of recidivism if they evince defendant's incorrigibility." *United States v. Schwalk*, 412 F.3d 929, 933 (8th Cir. 2005) (court did not abuse its discretion in considering defendant's history of relatively minor offenses that were not counted in his criminal history score in departing upward) (quoting *United States v. Agee*, 333 F.3d 864, 867 (8th Cir. 2003)); *accord, United States v. Herr*, 202 F.3d 1014, 1017 (8th Cir. 2000) (no abuse of discretion in departing upward under § 4A1.3 where defendant's repeated violations showed disrespect for law and that leniency had not been effective).

Jason's criminal history, including his diagnosis as a pedophile, together with his conduct in this case, demonstrates a substantial risk of recidivism. In June 2010 Jason engaged in sharing child pornography using peer-to-peer software. PSR ¶ 56. Despite that he was distributing child pornography, Jason was allowed to plead to possession of child pornography, and he received a lenient sentence of only 90 days in jail. *Id.* Following his release from jail, Jason fared poorly on probation. In December 2011, within months of his release, Jason violated the terms of his probation by possessing an internet-capable laptop computer. *Id.* Despite the violation, Jason was not returned to jail. Instead, he was placed under house arrest and required to complete community service. *Id.* He violated the terms of his probation again, less than two years later in September 2013, by possessing an internet-capable gaming console. *Id.* Again, Jason was not returned to jail. Indeed, it does

not appear that any retributive action was taken. *Id.* Approximately six or seven months later, in April 2014, law enforcement downloaded child pornography from a motel where Jason was living. *Id.* Thereafter, law enforcement searched Jason's motel room and seized an internet-capable video game and a cell phone. *Id.* Jason admitted to viewing pornography, which also constituted a violation of his probation. *Id.* Jason returned to prison for 365 days. *Id.*

Significantly, sometime after his release from jail on the probation violation, Jason committed a new crime, Fourth Degree Criminal Damage to Property. PSR ¶ 57. Again, the criminal justice system responded with leniency – Jason received a stayed sentence and no action was taken on the violation of the terms of Jason's probation on the child pornography charge. *See Id.* ¶ 56. Within months of his conviction on this new charge, Jason began viewing and distributing child pornography. His conduct escalated to the rape of his girlfriend's 12-year old daughter, a child he referenced as his daughter. This offense conduct all occurred while Jason was still on probation for the June 2010 possession of child pornography charge. *Cf.* PSR ¶¶ 2b-2d, 2k with PSR ¶ 56. Clearly, leniency was not effective in curbing Jason's behavior and promoting respect for the law.

As part of his state court pornography conviction, Jason underwent a psychosexual evaluation in 2011. PSR ¶ 81. He was diagnosed as a pedophile. *Id.* In July 2011, Jason began sex offender treatment. *Id.* ¶ 82. Jason did not avail himself of the treatment, and as with probation, Jason fared poorly. In December 2011, within six months of the start of treatment, Jason was found in possession of an internet-capable laptop computer. *Id.* ¶ 56. In 2012, Jason's progress in treatment was rated "acceptable." *Id.* ¶ 82. In October 2013,

his progress was rated "minimal," and he was suspended for "slow progress and financial irresponsibility." *Id.* ¶¶ 82, 84. He returned to treatment for approximately two months in February 2014; he was terminated due to his incarceration for a probation violation. *Id.* ¶ 84. He "made very slow progress" during this time. *Id.*

Jason returned to treatment in March 2015 and was discharged in July 2016. PSR ¶¶ 84, 88. After approximately 16 straight months in treatment, Jason's discharge letter noted that Jason was "not seen as a risk to reoffend in a sexual manner" and that he was "aware of the triggers to reoffending." *Id.* ¶ 88. Jason represented to the therapist that he was able to utilize "the support group he ha[d] developed appropriately." *Id.* The therapist's conclusions and Jason's representation are haunting, given that Jason began raping the 12-year old victim in July 2016, the same month he was discharged from treatment. Years of sex offender treatment did nothing to curb Jason's behavior. Indeed, he successfully deceived his therapist and his girlfriend to believe that he was not a danger to the 12-year old victim. Given Jason's ability to manipulate people, including a trained therapist, there is a genuine need to protect the community from further crimes of this Defendant.

Jason's conduct following the execution of the search warrant in this case is further evidence of his likelihood to recidivate. As detailed, law enforcement executed a search warrant at Jason's residence on August 25, 2016. PSR ¶ 8. Following the execution of that warrant, Jason moved out of the residence he shared with the 12-year old victim's mother. *Id.* ¶ 73. Nonetheless, Jason continued to communicate with the mother, urging her to pressure the 12-year old to falsely state that Jason had not done anything wrong. *Id.* ¶ 14.

Jason's attempts to cover-up his crimes support the conclusion that he is likely to recidivate.

Also following the execution of the search warrant, Jason began using a new cellular telephone. At the time of his arrest in January 2017, Jason tried to destroy that phone. PSR ¶ 12. Not surprisingly, that phone contained troubling evidence. Jason had applications related to TOR (short for "The Onion Router") on the phone. *Id.* TOR assists in anonymizing web activity, as it allows users to access websites without revealing their actual internet protocol address, geographic location, or other identifying information. *See* PSR ¶ 13. "The Tor network is designed to allow users to surf the internet anonymously and access otherwise hidden websites, including illegal websites . . . strictly devoted to child pornography." *United States v. Huyck,* 849 F.3d 432, 436 (8th Cir. 2017). The internet search history of the phone indicated that he had researched how to cover up his crimes. *Id.* Specifically, the search history revealed that searches had been conducted using several phrases, including the following:

- laws against false accusations;
- if a 13 year old falsely accuses someone do they get in trouble;
- false molestation accusations;
- what can a therapist report;
- if I tell my psychologist about a crime I committed can I get in trouble; and
- does a therapist have to report me if I committed a sex crime.

*Id.* Not only did Jason try to destroy the phone, but he also resisted arrest and attempted to flee. *Id.*

Jason's history demonstrates that there is a strong likelihood of recidivism. His criminal activity began with viewing child pornography and escalated to the rape of a 12-year old who considered him a father figure. The escalation in conduct occurred while Jason was in sex-offender treatment, where he had ready access to a therapist trained to assist him. It is clear that Jason either will not, or cannot, remain law abiding. His history in treatment suggests that change is not a priority for him. Jason will do what he wants to do, when he wants to do it. Further, given his documented attraction to minor girls, he poses a significant danger to the public. Consequently, a sentence of 336 months' imprisonment is necessary to protect the public.

     5.     The Need To Avoid Unwarranted Sentencing Disparities

A sentence of 336 months in custody also serves the goal of avoiding unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). Similar to Jason, the defendant in *United States v. Mahoney,* 527 Fed. Appx. 467 (6th Cir. 2013), pleaded guilty to (1) attempted coercion and enticement; and (2) distribution of child pornography. He was sentenced to 360 months in prison, which was at the low end of the advisory Guidelines range. *Id.* at 470. Specifically, the defendant's base offense level was 42, his criminal history was I, and he had a resulting sentencing range of 360 months to life. In *Mahoney,* the defendant engaged in separate, sexually explicit on-line chats with two undercover officers. *Id.* at 469-70. In chats with one officer, the defendant discussed in detail his interest in engaging in various sex acts with the persona's three minor children, ages 4, 8,

and 11. *Id.* at 469. The other officer posed as a 15-year old girl. In chats with this persona, the defendant engaged in graphic sexual discussions and made arrangements to meet the girl the next day for sex. *Id.* Law enforcement arrested the defendant when he showed up to meet the girl at a pre-arranged location. *Id.* Following his arrest, the defendant admitted that he had engaged in "oral, vaginal and anal intercourse with his stepdaughter" at least five times beginning when she was 6 or 7 years old until she was 10. *Id.* Follow-up investigation revealed that the defendant had been using a peer-to-peer file-sharing program to download and distribute child pornography. *Id.*

Also similar to Jason, the defendant in *United States v. Anderson,* 509 Fed. Appx. 868 (11th Cir. 2013), pleaded guilty to attempted coercion and enticement. He was sentenced to 324 months in prison, which was at the low end of the advisory Guidelines range. *Id.* at 871. In *Anderson,* the defendant arranged through emails, phone calls, and a face-to-face meeting with an undercover officer posing as a stepfather to two boys, ages 11 and 14, to have a sexual encounter with the two children at a hotel. *Id.* The defendant was arrested after he arrived at the hotel where the sexual contact was to occur. *Id.*

The Sixth Circuit case of *United States v. Hammonds,* 468 Fed. Appx. 593 (6th Cir. 593) is also instructive. In *Hammonds,* the defendant was sentenced to life in prison following his conviction for numerous child exploitation charges, including coercion and enticement, and distribution of child pornography. *Id.* at 595. The defendant was arrested after he engaged in separate on-line chats with two undercover officers. *Id.* at 595-96. The defendant's offense level was 46, and his criminal history category was I, resulting in an advisory guidelines range of life.

Jason's conduct here is far worse than or on par with the conduct of the defendants in the cases cited above. The Government is recommending 336 months' imprisonment, which is below the Guidelines range of life, because Jason quickly acknowledged his guilt and accepted responsibility for his horrific actions. By recommending a below-the Guidelines of 336 months here, the Government recognizes that Jason saved limited prosecutorial and judicial resources. He also acted to avoid further traumatization of the victim. A sentence of 336 months' imprisonment is in keeping with the goal of avoiding unwarranted sentencing disparities.

C. <u>A Supervised Release Term Of Life Is Appropriate Under The Circumstances Present Here</u>

Supervised release "is a unique method of post-confinement supervision," *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991), that "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). It "is not punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Rather, "congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty," *Johnson v. United States*, 529 U.S. 694, 708-09 (2000).

In the main, Congress authorized only short terms of supervised release. For class A felonies, the most serious category of federal offenses, a supervised release term ordinarily may not exceed five years. 18 U.S.C. § 3583(b)(1). Child exploitation crimes, however, fall into a discrete group of offenses for which Congress went further, mandating a minimum supervised release term of five years and authorizing a maximum term of life.

*Id.* § 3583(k). Of course, this suggests that Congress saw a grave danger to public safety from individuals who seek to exploit children, beyond the danger posed by a run-of-the-mine felon. Indeed, the Guidelines urge district courts to impose the maximum term available for sex offenders like Jason. *See* U.S.S.G. §5D1.2(b). Jason is a hands-on sexual predator who repeatedly raped a 12-year old girl. The sexual abuse occurred after Jason "successfully" completed sex-offender treatment. PSR ¶ 88. A life term of Supervised Release is necessary to ensure that Jason is monitored appropriately so that he does not rape another child. Accordingly, the Government urges the Court to impose a Supervised Release term of life.

### III. CONCLUSION

For the reasons set forth above, the Government respectfully asks the Court to sentence Jason to 336 months' imprisonment, followed by a life term of Supervised Release. The requested sentence is commensurate with Jason's criminal conduct and consistent with the Section 3553(a) factors. Most importantly, under all the facts and circumstances of this case, it is also fair and just.

Dated: July 26, 2017

                                                Respectfully Submitted,

                                                GREGORY G. BROOKER
                                                Acting United States Attorney

                                                *s/ Carol M. Kayser*

                                                BY: CAROL M. KAYSER
                                                Assistant U.S. Attorney
                                                316 North Robert Street, Suite 404
                                                Saint Paul, Minnesota 55101
                                                (651)848-1926